## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| HECTOR IGNACIO CARRASQUERO GUEVARA,<br><br>       Plaintiff,<br><br>v.<br><br>STERLING INFOSYSTEMS, INC.,<br><br>       Defendant. | **Case No.**: 6:24-cv-01935<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Hector Ignacio Carrasquero Guevara ("Plaintiff" or "Mr. Guevara") brings this action on an individual basis, against Sterling Infosystems, Inc., ("Defendant" or "Sterling"), for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq*., arising out of an employment purposed consumer report published by Defendant to Plaintiff's prospective employer, which falsely portrayed Plaintiff as being a violent criminal charged with misdemeanor Assault – Bodily Harm.

## INTRODUCTION

1.     This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681.

2.     Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to entities who ultimately resell those consumer reports to employers who use the reports to make decisions regarding whether to offer, revoke, or terminate employment.

3.     Defendant published a consumer report containing inaccurate information about Plaintiff to Plaintiff's prospective employer. Specifically, Defendant reported that Plaintiff was charged with a misdemeanor for assault-bodily harm. Defendant's reporting is grossly inaccurate and untrue.

4.     Plaintiff has never been charged with or convicted of misdemeanor assault bodily harm, or any other crime in his life.

5.     Plaintiff's prospective employer denied Plaintiff's employment application after receiving a consumer report from Sterling, which included the inaccurate misdemeanor charge reported by Defendant that *does not belong to Plaintiff*.

6.     Defendant could have easily avoided selling the inaccurate consumer report had Defendant reviewed the widely available public court records from Shelby County, Tennessee regarding the misdemeanor assault charge prior to publishing the consumer report concerning Plaintiff's to Plaintiff's prospective employer.

7.     Had Defendant performed even a cursory review of the public court records, it would have discovered that the criminal record belongs to a different consumer who is wholly distinguishable from Plaintiff by their middle name, Social Security Number ("SSN"), and who lives in a different part of the Country than Plaintiff.

8.     Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9.     Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their employers with inaccurate criminal record information.

10.     Defendant's inaccurate report cost Plaintiff a good paying job and job security.

11.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress,

including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12.     Alternatively, Defendant was negligent in that it owed a duty of care, which it breached, and ultimately caused Plaintiff's damages.

13.     Alternatively, as a result of Defendant's negligence, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

14.     As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA and Cal. Civ. Code § 1785.14.

## **PARTIES**

15.     Hector Ignacio Carrasquero Guevara ("Plaintiff" or "Mr. Guevara") is a natural person residing in St. Cloud, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c) and Cal Civ. Code § 1785.3(b).

*Hector Ignacio Carrasquero Guevara v. Sterling InfoSystems, Inc.*
COMPLAINT

16.     Defendant Sterling Infosystems, Inc., ("Defendant" or "Sterling") is a corporation doing business throughout the United States, including the State of Florida and in this District, and has a principal place of business located at 6150 Oak Tree Blvd, Suite 490, Independence Ohio, 44131. Defendant can be served at it's registered agent for service Paracorp Incorporated at 155 Office Plaza Drive, 1st Floor, Tallahassee, FL 32301.

17.     Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

18.     Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f) and Cal Civ. Code § 1785.3(d) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumers reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

21.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

23.     Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

*Hector Ignacio Carrasquero Guevara v. Sterling InfoSystems, Inc.*
COMPLAINT

24.     Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

25.     Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared concerning Plaintiff.

26.     The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

27.     In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

28.     The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30.     Defendant disregarded its duties under the FCRA with respect to the consumer report it published about Plaintiff.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

31.     Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

32.     As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

33.     The criminal background check industry takes in revenues in excess of three billion dollars, annually.

34.     Background checks are generally created by running automated searches through giant databases of aggregated public record data. The reports are created and disseminated with little to no manual, in-person review, and the court records are rarely directly reviewed in creating background checks.

35.     Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019),
https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf
("CFPB Report").

*Hector Ignacio Carrasquero*
*Guevara v. Sterling InfoSystems,*
*Inc.*
COMPLAINT

level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

36.     Given that Defendant is in the business of selling consumer reports, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

37.     Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to their customers.

38.     Defendant reports such erroneous and incomplete information because Defendant wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

39.     Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

40.     Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting a criminal record that belongs to an

unrelated consumer who has a different middle name, SSN, and who lives in a different part of the Country than Plaintiff.

41.     As a provider of consumer reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff Applies for a Job with RPM Living LLC ("RPM")

42.     Plaintiff has been working as a leasing agent at Altman Management Company for approximately since June 1, 2024, without issue.

43.     After Plaintiff's manager was fired from Altman Management Company, Plaintiff began to worry that his employment with Altman Management was in jeopardy, so he began seeking other employment opportunities.

44.     On or about July 25, 2024, Plaintiff applied to RPM, a company he has worked for in the past, which offers higher pay through various benefits and overtime opportunities and has a more lucrative commission structure than Altman Management Company.

45.     Upon applying to RPM, Plaintiff was required to consent to a new background check.

46.    On or about July 25, 2024, RPM offered a job to Plaintiff pending the results of a background check. Plaintiff's anticipated start date with RPM was July 30, 2024.

47.    Plaintiff anticipated that there would be no issue with his employment application to RPM as he had worked for them before and has no criminal record. Further, Plaintiff has never had an issue with his background checks before.

48.    Therefore, on or about July 25, 2024, Plaintiff gave Altman Management Company his two weeks' notice letter of resignation.

49.    RPM contracts with Sterling to conduct background checks, including criminal background checks, on its prospective employees.

50.    On or about July 25, 2024, RPM ordered a criminal background check on Plaintiff from Sterling.

**Defendant Published an Inaccurate Consumer Report about Plaintiff to RPM**

51.    RPM contracted with Defendant to conduct background checks, including criminal background checks.

52.    On or after July 25, 2024, RPM Living ordered a criminal background check on Plaintiff from Defendant.

53.    On or about July 31, 2024, in accordance with standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to RPM.

54.     Within its consumer report about Plaintiff, Defendant published inaccurate information about Plaintiff.

55.     Specifically, Defendant's consumer report about Plaintiff included a grossly inaccurate and stigmatizing misdemeanor assault – bodily harm charge from Shelby County, Tennessee, which appeared in the consumer report as follows:



56.     The criminal record reported by Defendant about Plaintiff to RPM , *does not* belong to Plaintiff.

57.     Plaintiff has never been charged with or convicted of misdemeanor assault - bodily harm, or any other crime in his life.

58.     A cursory review of the widely available public court record confirms that the record belongs to an unrelated Hector Guevara ("Misdemeanant Guevara").

59.     Had Defendant actually consulted or obtained the widely available public court records regarding the criminal record it reported to Plaintiff's prospective employer, it would have seen obvious discrepancies between Misdemeanant Guevara and Plaintiff.

60.     The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as Misdemeanant Thomas include the following:

(a)     Plaintiff's legal name is "Hector Carrasquero Guevara" and the criminal records belong to a "Hector Guevara" (no middle name), which is clearly indicated on the face of the records;

(b)     Plaintiff lived and was in St. Cloud, Florida, at and around the time the misdemeanor assault offense was allegedly committed, yet the public court records indicate that Misdemeanant Guevara's address at the time the misdemeanor assault offense was allegedly committed was in Memphis Tennessee; and

(c)     Plaintiff's Social Security number, which was provided to Defendant is entirely different than that of Misdemeanant Guevara.

*Hector Ignacio Carrasquero Guevara v. Sterling InfoSystems, Inc.*
COMPLAINT

61.     The sole reason the inaccurate criminal record was reported as belonging to Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Plaintiff's prospective employer.

62.     Had Defendant followed reasonable procedures, it would have discovered that the inaccurate, stigmatizing criminal charge belonged to an unrelated individual with a different middle name, SSN, and who lived in a different part of the Country than Plaintiff.

63.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate and stigmatizing information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**RPM Retracts Plaintiff's Job Offer and Denies Plaintiff's Job Application**

64.     On or about Jul 31, 2024, Defendant sold a consumer report about Plaintiff to Plaintiff's prospective employer, RPM.

65.     On that same day Plaintiff received an email with a pre-adverse action notice and a copy of the consumer report, which Defendant sold to RPM.

66.     Plaintiff was shocked and humiliated upon reviewing and realizing that the serious criminal charge of another namely Misdemeanant Guevara, was published in the consumer report sold by Defendant about Plaintiff to RPM.

67.     Plaintiff was very panicked, confused, and concerned about the impact of Misdemeanant Guevara's' serious criminal charge reported on the subject consumer report – specifically, the impact of the same on his future.

68.     Specifically, Defendant matched Plaintiff and Misdemeanant Guevara and published the criminal record of Misdemeanant Guevara in a consumer report about Plaintiff and sold that report to Plaintiff's prospective employer. This exculpatory public record information was widely available to Defendant prior to publishing Plaintiff's consumer report to Plaintiff's employer, but Defendant failed to perform even a cursory review of such information.

69.      Plaintiff is also currently going through the process of becoming a citizen and feared that having a criminal record reported about him could result in the denial of his citizenship or could even result in him being deported back to Venezuela.

70.     On or about August 7, 2024, Plaintiff was notified by RPM that his employment application was denied as a direct result of the misdemeanor assault charge reported by Defendant.

71.    Plaintiff contacted RPM and informed them that he has never lived in Tennessee, that he is not Misdemeanant Guevara, and that he has a different social security number from that of Misdemeanant Guevara. Plaintiff explained that the serious criminal charge of Misdemeanant Guevara does not belong to him.

**Plaintiff Disputed the Misinformation in Defendant's Consumer Report**

72.    On July 31, 2024, desperate to secure employment with RPM and riddled with worry over the far-reaching impacts of being confused with a violent criminal, Plaintiff disputed the inaccurate information with Defendant. Plaintiff disputed via telephone with Defendant.

73.    Plaintiff identified himself and provided information to Defendant to support his dispute.

74.    Plaintiff specifically disputed the criminal record of Misdemeanant Guevara.

75.    Plaintiff specifically stated that the criminal record of Misdemeanant Guevara does not belong to him.

76.    Plaintiff specifically asked Defendant to investigate and delete Misdemeanant Guevara's criminal record from any consumer report about Plaintiff.

77.    On or about August 6, 2024, Plaintiff contacted RPM to inform them that he had disputed the inaccurate misdemeanor assault charge with Defendant, and asked RPM to run a background check through a different company. However, RPM

16/23

told Plaintiff that there was nothing that can be done until the consumer report from Defendant was corrected.

78.     On August 8, 2024, Plaintiff received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute and removed the misdemeanor assault charge from the subject consumer report.

79.      On or about August 12, 2024, RPM informed Plaintiff that they had moved in a different direction, and the position which Plaintiff applied for was already filled.

80.     On or about August 13, 2024, after discovering that working at RPM was no longer a possibility, Plaintiff sent an email to Altman Management Company rescinding his resignation. Plaintiff reasonably believes that due to Defendant's inaccurate reporting in the first instance, RPM formed a negative opinion about Plaintiff and moved on to other candidates.

81.     Defendant's inaccurate consumer report cost Plaintiff a good paying job with competitive benefits, and job security.  Furthermore, Plaintiff stood to make more money with RPM than he does working for Altman Management Company.

82.     In addition, Defendant's conduct caused Plaintiff to rescind his resignation and continue working at Altman Management Company, in an uncomfortable environment where his employer may now question his loyalty and commitment to the company. Altman Management Company only accepted

Plaintiff's recission of his resignation because of Plaintiff's past performance, but his current work environment is not ideal. Plaintiff feels like he is now being treated differently because of his resignation attempt.

83.   Moreover, Plaintiff has family in Venezuela that rely on him financially, and the position at RPM provided Plaintiff with more economic opportunity and earning potential.  Plaintiff's mother recently had surgery and needs additional money for her recovery. Plaintiff was extremely stressed that he would not be able to provide for his mother and sisters if he lost both jobs as a result of the inaccurate consumer report sold by Defendant concerning Plaintiff.

84.   When Plaintiff learned about the inaccurate reporting of the misdemeanor assault charge which belonged to Misdemeanant Guevara, Plaintiff became depressed, had trouble sleeping, suffered from bad headaches, and was very worried for his family in Venezuela that rely on him financially. Plaintiff feels extremely anxious and wakes up in the middle of the night panicking with pain in his chest.

85.   In addition, Plaintiff's challenges with his employment as a consequence of Defendant's inaccurate reporting has caused Plaintiff to live with the fear of losing his house and car and being unable to pay down his increasing credit card debt.

*Hector Ignacio Carrasquero*
*Guevara v. Sterling InfoSystems,*
*Inc.*
COMPLAINT

86.     Plaintiff also felt humiliated because the inaccurate criminal record on the consumer report Defendant sold to RPM does not reflect who Plaintiff is and Plaintiff believed that his reputation was ruined, especially with RPM where he knew and had worked with the manager previously.

87.     The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

88.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

89.     At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

90.     Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

*Hector Ignacio Carrasquero Guevara v. Sterling InfoSystems, Inc.*
COMPLAINT

91.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

92.     As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy in violation of 15 U.S.C. § 1681e(b) of the FCRA .

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

93.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

94.     Defendant is a "consumer reporting agenc[ies]" as defined by 15 U.S.C. § 1681a(f).

95.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

96.     At all times pertinent hereto, the above-mentioned employment-purposed report or background check report was a "consumer report[s]" as that term is defined by 15 U.S.C. § 1681a(d).

97.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment reports they sold about Plaintiff as well as the information they published within them.

98.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

99.     Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

*Hector Ignacio Carrasquero Guevara v. Sterling InfoSystems, Inc.*
COMPLAINT

100.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

//

RESPECTFULLY SUBMITTED this 28th day of October 2024,

**CONSUMER ATTORNEYS**

By:*/s/ David Pinkhasov*
David Pinkhasov, FL #1040933
72-47 139th Street
Flushing, NY 11367
T: (718) 701-4605
E: dpinkhasov@consumerattorneys.com

Catherine Tillman, Esq., FL #0057663
CONSUMER ATTORNEYS
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (718) 715-1750
E: ctillman@consumerattorneys.com

*Attorneys for Plaintiff,*
*Hector Ignacio Carrasquero Guevara*